UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| DEBRA CHESNUT and GLENN CHESNUT, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants. | Civil No. 6:17-cv-00079-GFVT-HAI <br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case is a medical malpractice action alleging that Defendants were negligent in their care of Plaintiff Debra Chesnut. Pending before the Court are Defendant United States' Motion to Exclude the testimony of one of Plaintiffs' experts, J. Gregory Roberts, M.D, and the United States' alternative Motion for Summary Judgment. For the reasons that follow, these motions are **DENIED**.

**I**

**A**

In a diversity action, the substantive elements of a medical malpractice suit are questions to be determined by state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under Kentucky law, a plaintiff must establish the following elements in a medical malpractice case: standard of care, breach of the standard of care, causation, and injury. *Clines v. Susan E. Janocik, M.D., PLLC*, No. 2016-CA-000122-MR, 2017 WL 2705401, at \*5 (Ky. Ct. App. June 23, 2017). As to the first element, to meet the standard of care a physician must "use the degree of care and

skill expected of a competent practitioner of the same class and under similar circumstances." *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687 (Ky. 2003). Notably, a plaintiff must generally establish each of the four elements by way of expert testimony. *Clines*, 2017 WL 2705401, at *5 (citing *Blankenship v. Collier*, 302 S.W.3d 665 (Ky. 2010)). Where a plaintiff fails to introduce evidence sufficient to establish each element, then the defendants are entitled to summary judgment as a matter of law. *See, e.g., Blankenship*, 302 S.W.3d at 668.

### B

While state law governs substantive claims in a diversity case, federal law generally governs procedural and evidentiary issues, including the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Admissibility of expert testimony is governed specifically by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Sixth Circuit has identified three specific Rule 702 requirements in deciding the admissibility of proposed expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). First, the proposed expert must have the requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *Id.* at 529 (quoting Fed. R. Evid. 702). Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting

Fed. R. Evid. 702). Third, the testimony must be reliable. *Id.*; *see also Daubert*, 509 U.S. at 590.

As to the third requirement, Rule 702 provides a number of standards by which a district court in its gatekeeper role is to gauge reliability of expert testimony. A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). Additionally, in determining reliability, a district court is to consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts are given broad discretion in determining whether a particular expert's testimony is reliable. *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Notably, in exercising this discretion, a court must be careful not "to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC,* 579 F. App'x 372, 377 (6th Cir. 2014). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II

Plaintiffs indicate they intend to call Dr. J. Gregory Roberts to testify, in relevant part, that Dr. Jared Madden deviated from the accepted standard of care and that this deviation was a proximate cause of Chesnut's injury. In turn, the United States[1] filed the present motion, asking the Court to exclude Dr. Roberts' expert testimony on these issues of standard of care and causation. [R. 221.] Specifically, the United States argues that Dr. Roberts' statements in both his written expert reports and his deposition testimony "fail to meet the standards of scientific reliability required by Federal Rule 702, *Daubert*, *Kumho*, and subsequent case law." [R. 221-1 at 8.]

### A

In its initial memorandum filed in support of its motion to exclude the United States focuses largely on the alleged unreliability of Dr. Roberts' testimony. However, interspersed throughout its discussion on this specific issue, it also appears to make fleeting arguments that a Doctor of Medicine (M.D.) like Dr. Roberts, is not competent or qualified to testify as to the standard of care applied by a Doctor of Osteopathy (D.O.) like Dr. Madden. [*See* R. 221-1 at 11 (discussing Dr. Roberts' "admitted lack of knowledge and experience in the field of osteopathy. . .").] In its reply brief, the United States then argues more directly that "Dr. Roberts is simply not qualified to testify as to the standard of care employed by Dr. Madden." [R. 253 at 4-5.] Accordingly, the Court will first address these preliminary matters of expert witness competency

---

[1] As noted in the United States' Motion to Exclude [R. 221-1 at 2 fn. 1], the United States Department for Health and Human Services, has determined that the federally funded community health center for which Dr. Madden worked, Grace Community, is eligible for coverage under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. As such, the United States moved to dismiss Dr. Madden as a defendant and substitute the United States and this Court granted that motion on January 8, 2018 [R. 65].

4

and qualification.

Two separate legal standards are implicated by the United States' arguments concerning qualification and competency. In fact, the Sixth Circuit has noted that "in the context of the admissibility of expert-witness testimony, it is somewhat unclear how Fed. R. Evid. 601—which determines witness *competency* based on state law for claims where 'State law supplies the rule of decision'—interacts with Fed. R. Evid. 702—which determines witness *qualification* based on federal law under *Daubert* and its progeny." *Bock v. Univ. of Tennessee Med. Grp., Inc.*, 471 F. App'x 459, 461 (6th Cir. 2012) (emphasis in original) (citation omitted). For analysis' sake, the Sixth Circuit has "reconciled the tensions between Rules 601 and 702 by separating these two inquiries." *Id.* Under each of these separate yet related inquiries Dr. Roberts' expert testimony passes muster.

First, the Court will consider whether Dr. Roberts is qualified, the first prong under Rule 702. The Plaintiffs' theory of the case rests largely on Dr. Madden's alleged failure to conduct an appropriate vascular examination. [R. 248 at 10.] In large part, Dr. Roberts' testimony is that Dr. Madden "failed" to give a proper vascular examination and thus failed to meet the standard of care. [R. 233 at 67.] As a board-certified general and vascular surgeon who has been in practice for over 17 years [R. 233 at 31, 145], Dr. Roberts is undoubtedly able to offer a qualified opinion on the standard of care as it relates to an appropriate vascular examination and closely related vascular matters. To the extent that the United States argues that, under Rule 702, Dr. Roberts is unqualified to offer this testimony, that argument is unavailing. Dr. Roberts' credentials in his field of practice are unquestioned and he is qualified under Rule 702 to testify as to the standard of care for a vascular examination.

5

Second, any argument that, pursuant to Rule 601, Dr. Roberts is not competent to testify under state law standards is similarly unfounded. The United States in correct in stating that Kentucky courts have no "blanket rule" that licensed medical doctors are automatically qualified to testify as an expert on every medical question. [R. 253 at 2-3.] The converse, however, is also true, as under Kentucky law "a physician or other medical provider is not automatically disqualified from testifying against a defendant who specializes in a different area of medicine or who is licensed or practices in a different medical discipline." *Tapp v. Owensboro Med. Health Sys., Inc.*, 282 S.W.3d 336, 341 (Ky. Ct. App. 2009). Indeed, the question in this context is Dr. Roberts' ability and competence to opine on the standard of care for this specific practice or procedure. *See Thompson v. Mayflower Coal Co.*, 379 S.W.2d 459, 460-61 (Ky. 1964); *see also Tapp*, 282 S.W.3d at 341 (citations omitted) ("In Kentucky, expert witness assessment turns on whether the proposed witness's special knowledge, skill, experience, training, or education will assist the jury.").

In support of its argument that Dr. Roberts is not competent to testify under Kentucky law, the United States points to one easily distinguishable case, *Morgan v. Hill*, 663 S.W.2d 232 (Ky. Ct. App. 1984). In that case, the Kentucky Court of Appeals held that a neurosurgeon could not testify to a chiropractor's standard of care, "because he [did] not have the appropriate training and experience to determine what constitutes chiropractic malpractice . . .." *Id.* at 234. The holding in *Morgan* focused on the specific issues that exist where parties attempt to use medical doctors to establish the standard of care for procedures in a separate field, chiropractic medicine. In the present case, it remains that Plaintiffs indicate Dr. Roberts will testify to the specific standard of care relating to the vascular examination. The United States does not argue

6

that the standard of care for this particular examination differs in any way when a D.O. is performing it versus a M.D. In fact, in Dr. Madden's deposition, he claimed that DOs "do everything [MDs] do and some other stuff." [R. 235 at 22.] On the record, a vascular examination appears to fall into the former category, something that both MDs and DOs are expected to be able to perform. Thus, given Dr. Roberts' familiarity with that particular subject matter, it is irrelevant that he is not the exact same type of doctor as Dr. Madden, or that he is not familiar with osteopathic medicine as a whole.[2] *See Tapp*, 282 S.W.3d at 341 (citations omitted) ("In Kentucky, expert witness assessment turns on whether the proposed witness's special knowledge, skill, experience, training, or education will assist the jury."). Dr. Roberts is competent under Kentucky state law to testify as to the standard of care for a vascular examination.

## B

The Court will now address the United States' argument that Dr. Roberts' testimony is unreliable under the third prong of Rule 702.[3] In doing so, this Court will look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29 (quoting Fed. R. Evid. 702). The preliminary inquiry is "whether the reasoning or methodology underlying the

---

[2] Of course, any of Dr. Roberts' testimony which may be interpreted to disparage or otherwise criticize osteopathic medicine generally is not relevant nor proper. [*See* R. 233 at 145 (characterizing D.O.'s medical knowledge as "typically wanting.")]. It does not appear, however, that Plaintiffs will attempt to use this type of testimony or otherwise pursue such a strategy in support of their case.

[3] The United States does not contest the relevancy of Dr. Robert's testimony. Thus, the Court will not address relevancy, the second requirement of admissibility under Rule 702.

7

testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Dilts v. United Group Servs., LLC*, 500 Fed. App'x 440, 445 (6th Cir. 2012) (quoting *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002)). Notably, experts are given a wide latitude in their opinions, "so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert,* 509 U.S. at 592).

As noted above, the Plaintiffs indicate that Dr. Roberts' testimony will relate to the following: "Dr. Madden's failure to conduct an appropriate vascular examination, his failure to recognize vascular symptoms and his failure to treat said symptoms, not his osteopathic manipulative treatment." [R. 248 at 10.] In order to form an opinion on whether Dr. Madden met the standard of care, Dr. Roberts first reviewed Ms. Chesnut's medical records. [R. 233 at 235-27.] Based upon this review and "the medical literature and [his] personal experience," Dr. Roberts concluded that the failures by Defendants "to timely diagnose progressively ischemic lower extremities represent[ed] a deviation of the standard of care." [R. 233 at 236-37.] As to causation, Dr. Roberts' report states that but for "the error in diagnosis which led to a protracted delay in diagnosis," it is his medical opinion "that Ms. Chesnut would not be an amputee." *Id.* at 237.

**1**

The Court will first address whether this testimony is permissible as it relates to the standard of care. The United States asserts that because Dr. Roberts focuses on "what symptoms an exam *might* have revealed," which was "nowhere documented in the medical record," his testimony is impermissibly speculative. Notably, the United States does not argue that Dr.

8

Roberts' proposed examination lacks scientific validity. The main issue then as it concerns reliability is whether Dr. Madden applied the principles or methods, here, the signs that point toward an apparent need for a more thorough vascular examination, reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29 (quoting Fed. R. Evid. 702). In other words, is Dr. Roberts' opinion that the Defendants should have performed a more thorough vascular examination based on the facts of the case or "purely on speculation?" *Dilts*, 500 F. App'x at 445 (citation omitted).

Dr. Roberts' testimony on this topic boils down to this: based on the symptoms Ms. Chesnut was complaining of and exhibiting, the Defendant medical professionals should have given a certain type of examination; the Defendants, however, failed to give the proper examination; this failure to properly examine Ms. Chesnut led to a missed diagnosis; the missed diagnosis led to the eventual amputation of her leg, which could have been avoided. Specifically, Dr. Roberts found significant that at the time Ms. Chesnut was examined by Dr. Madden she was known to be a heavy smoker [R. 233 at 236] and complained of pain and coldness in her legs. *Id.* at 152. Based upon these risk factors and symptoms, Dr. Roberts opines that Dr. Madden's subsequent examination failed to meet the standard of care.

Solely because the basis of Dr. Roberts' reasoning largely focuses on what Dr. Madden missed or failed to find significant—which, logically, would be missing from the records of these examinations—does not render Dr. Roberts' opinion impermissibly speculative in nature. *Dilts*, 500 F. App'x at 445 ("Rule 702 does not require an expert to have absolute certainty in formulating his opinion."). His reports and deposition testimony discuss the specific signs that he believes necessitated a certain examination and, further, detail the alleged inadequacies of Dr.

Madden's examination. As such, this Court finds that Dr. Roberts applied scientifically valid principles "reliably to the facts of the case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29 (quoting Fed. R. Evid. 702). Therefore, Dr. Roberts' testimony concerning the standard of care is sufficiently reliable and will not be excluded.

### 2

The Court next turns to whether Dr. Roberts' testimony concerning the causation is sufficiently reliable under Rule 702. As to his causation opinion, the United States similarly asserts that Dr. Roberts' opinion "is unreliable and should be excluded because it is conclusory and does not rest on valid methodology, but rather, hindsight." [R. 221-1 at 15.] As a preliminary matter, it is necessary to clarify the causal connection at issue. Here, the United States rightly points out that Plaintiffs must ultimately prove that Dr. Madden's alleged failures on April 12, 2016 were a proximate cause in bringing about the amputation on April 19, 2016. [R. 221-1 at 20.] To put it another way: Dr. Roberts' testimony must provide an adequate explanation of how, if Dr. Madden had properly diagnosed the vascular issues present in the leg when he examined Ms. Chesnut, the end result could have been different.

As noted above, Dr. Roberts' report states that "but for this error in diagnosis which led to a protracted delay in diagnosis, it is my medical opinion that based upon a reasonable degree of medical probability that Ms. Chesnut would not be an amputee." [R. 233 at 237.] In his deposition testimony, Dr. Roberts indicates he believes that Ms. Chesnut's condition progressively worsened from April 4th to April 13th, the day Ms. Chesnut's leg turned blue—and the day after Dr. Madden's examination. [R. 233 at 181.] Specifically, he theorizes that the clot in her leg moved from her feet to her thigh up to her pelvis in that time period. *Id.*

Importantly, he states that her leg "got to that point of no return probably within maybe the evening after seeing Dr. Madden because the next day, her leg was cyanotic." *Id.* at 180.

The United States argues that Dr. Roberts' causation explanation "boils down to an inadmissible 'earlier, the better'" theory of causation. [R. 221-1 at 18 (citing *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).] While acknowledging that any speculative "earlier, the better" testimony is inadmissible generally, such a characterization is inaccurate in the current context. Dr. Roberts is not engaging in pure speculation. Instead, he is giving his opinion, based on personal practical experience and relevant medical literature, that the condition worsens over time such that diagnosis of the condition even a day earlier can materially change the ultimate outcome. Indeed, a brief review of some of the literature upon which Dr. Roberts relies supports the notion that prompt diagnosis and treatment is crucial when patients present with this particular condition. [*See* R. 233 at 247–55.] The United States' objections go more to the credibility and weight of the causation testimony rather than its admissibility. As such, the proper means of attacking this testimony is by means of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . .." *Daubert*, 509 U.S. at 596. Dr. Roberts' testimony concerning causation is sufficiently reliable and will not be excluded.

## IV

It may be that, in the context of trial, the United States desires to object to particular language used by Dr. Roberts or certain portions of his testimony. The Court will certainly consider more specific objections at that time. At the present hour, however, the Court sees no basis for the wholesale exclusion of Dr. Roberts' anticipated testimony. Plaintiffs will be

allowed to call Dr. Roberts as an expert. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant United States' Motion to Exclude the expert testimony of Dr. J. Gregory Roberts [**R. 221**] is **DENIED**;

2. The United States' alternative Motion for Summary Judgment [**R. 221**], premised entirely on the alleged inadmissibility of Dr. Roberts' testimony, is also **DENIED**;

3. Defendants James Thomas, M.D., and Delta Locum Tenens, LLC's Motion to Join the United States' Motion to Exclude [**R. 222**] is **DENIED** as moot; and

4. Plaintiffs Debra Chesnut and Glenn Chesnut's Motion for Leave to File a Separate Response to above Defendants' Motion to Join [**R. 249**] is also **DENIED** as moot.

This the 17th day of December, 2019.

Gregory F. Van Tatenhove
United States District Judge